895 P.2d 232

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Donald Morris ROWELL, a/k/a Jimmie Carrol Rowell, Defendant–Appellant.**

**No. 15365.**

Court of Appeals of New Mexico.

March 16, 1995.

Certiorari Granted April 22, 1995.

Tom Udall, Atty. Gen., Matthew Ortiz, Richard J. Klein, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, Christopher Bulman, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

BLACK, Judge.

Between September 18, 1992 and September 22, 1992, residents of the New Mexico communities of Clovis, Raton, and Carlsbad each received virtually identical telephone calls from a man claiming to be a Nevada attorney named either Sam or Jim Odem. Odem informed at least two of the New Mexico residents that he was awarding money from a lawsuit to customers of a fraudulent telemarketing company. Although the third resident could not recall Odem's exact reasons, she believed that his promise of a monetary award stemmed from her prior dealings with a telemarketing company. Odem told each of the three New Mexico residents that before they could collect their refund, they would have to send a court referee in Florida ten percent of the amount owed to them for fees or court costs. Upon receiving these phone calls, each resident notified the authorities.

A Curry County grand jury indicted Defendant, as the caller identified as Odem, on one count of computer access with intent to commit fraud over $250, a fourth degree felony in violation of NMSA 1978, Section 30-45-3 (Repl.Pamp.1989), and one count of attempt to commit fraud over $250, a misdemeanor under NMSA 1978, Sections 30-16-6 and 30-28-1 (Repl.Pamp.1994). A jury convicted Defendant on both counts.

On appeal, Defendant raises nine challenges to the jury verdict. We affirm on all issues except Defendant's conviction under Section 30-16-6.

*FACTS*

Alan Isbell, a Clovis resident, testified that on September 21, 1992, he received a telephone call from a person who identified himself as Sam Odem. Odem said he was an attorney calling from Las Vegas, Nevada,

and that he was in the process of awarding a legal settlement from a disreputable telemarketing company. Odem told Isbell that, as a prior customer of the company, he was entitled to receive a cashier's check for $2200, but first Isbell would have to pay $220 in court costs. Odem advised Isbell to use Western Union to forward a $220 cash advance to the court referee, Jason Daniels, in St. Petersburg, Florida. Isbell became suspicious and asked Odem to call back the next day. In the meantime, Isbell contacted Jim Skinner, an investigator with the Curry County District Attorney's office. Skinner connected a recording device to Isbell's telephone and made arrangements for a money transfer.

On September 22, 1992, Odem again called Isbell. The district attorney's office recorded those calls and played the recordings for the jury at Defendant's trial. Using the mechanism set up by Skinner, Isbell wired $220 to Florida as instructed by Odem. Isbell, however, never received any money from Odem's telemarketing settlement.

Marie Butt of Raton testified that she received a similar call from Sam Odem directing her to wire money to court referee Daniels in Clearwater, Florida. She became suspicious, refused to transfer the funds requested by Odem, and contacted the New Mexico Attorney General's office.

Toni Grey of Carlsbad also received a telephone call from a man identified as Jim Odem. Odem told Grey that he was a Las Vegas attorney who was contacting her because she had been awarded money in a class action suit. Odem instructed Grey to wire $100 to Florida. Grey became suspicious and did not follow Odem's instructions. Instead, she called the Carlsbad Police Department and later the New Mexico Attorney General's office.

A Port Richey, Florida law enforcement officer arrested Daniels on September 22, 1993. At trial, the officer identified a Western Union money order form showing a $220 cash advance from Isbell to Daniels. Following questioning by the Port Richey Police Department and the United States Secret Service, Daniels implicated one William Thurston and a man named "Jim." Police

later located Thurston, who informed them that "Jim" might be found at a lounge named the Stumble Inn. Police proceeded to the lounge where Thurston pointed out "Jim." In court, the Port Richey police officer, as well as a United States Secret Service agent, identified "Jim" as Defendant.

After his arrest, Defendant consented to a search of his rooms at the Gulf Sands Motel. From those rooms, law enforcement officers seized "numerous telemarketing materials," including telephone bills, calling cards in the name of Calvin Root, and a four-page handwritten script describing the class action settlement against the Las Vegas telemarketers.

Thurston testified that he cashed checks for Defendant in return for twenty percent of the check amount. At some point, Defendant asked Thurston to employ other people to present the forms to Western Union, which he did. Thurston continued to retain twenty percent and paid the other people out of his portion. Thurston testified that he used Daniels in this manner approximately five or six times. Thurston also testified that, on one occasion, he had heard Defendant use the name Sam Odem.

**I. DEFENDANT'S CONVICTION FOR COMPUTER ACCESS WITH INTENT TO DEFRAUD IS SUPPORTED BY SUBSTANTIAL EVIDENCE.**

Defendant initially challenges the sufficiency of the evidence to support the essential elements of computer access with intent to defraud under Section 30–45–3.

**A. Evidence Presented at Defendant's Trial.**

Prior to trial, Defendant moved to quash the indictment, arguing that lifting a telephone receiver in Florida and dialing a New Mexico phone number did not, as a matter of law, amount to "accessing a computer" within the meaning of the New Mexico Computer Crimes Act, NMSA 1978, Sections 30–45–1 to –7 (Repl.Pamp.1989). In support of his motion, Defendant presented Gary Johnston, a digital electronics program-

ming instructor at Clovis Community College. Johnston testified that he had been an instructor for sixteen years and had spent almost ten years installing telephone switching equipment and working with electronic switching systems.

According to Johnston, an electronic switching system employs both an operations program and a translation program. Through the operations program, the computer knows how to connect a caller with other parties. The translation program stores customer information in the local office. This information includes, for example, whether the caller is entitled to services such as call waiting, call forwarding, and multiparty calling. By picking up a telephone handset, a caller can only access the services provided by the system and cannot "get into" the computer in the phone system to withdraw information or change the program. In refusing to quash the indictment, the district court ruled that it was "the province of a jury, whether or not they find that a computer, as defined in that section, was used by Mr. Rowell [Defendant] in the acts alleged here." We agree.

At trial, the State called Edward Isaacson, an investigations manager for GTE Florida, Inc. Isaacson testified that the telephone company's "switch" is based on electronic software that is "made up of numerous or multi-computers or micro-processors that are working together as a network that not only provide dial tone to the customer, but they gather the information for processing a call ... and store the information for billing purposes." The prosecution proceeded to question Isaacson as follows:

Q: [I]f the subscriber or anyone else punched in the numbers to call New Mexico from that phone [in Florida], would that person be accessing computer software?

A: Yes, sir. And, in order to process the call, the tones ... become digitized in that switch, but the switch, which again is numerous computer-type systems tied together, would accept the information he's feeding it, the number he wants to call, and would process it. One part of the system processes the call; the other

part gathers the information—his number, the time of day, whether the call [was] completed or not. And that's kept in a different part of the computer for later billing.

Q: So do I understand then that when you punch in those numbers, you access this computer software?

A: Yes, sir. That's what I'm saying.

The State also called David Bailey, who had been responsible for computer security at Los Alamos National Laboratory, as an expert in the field of computer systems and networks. Bailey testified that a digital computer system is often identical to the systems businesses buy to do data processing. He stated that "[t]he computer system takes information from the ... switching network. It makes decisions about routing of calls, and instructs the switching network how to make the connections." Bailey concluded, without objection, that in his opinion, "if a person makes a long distance telephone call from Florida or anywhere else to New Mexico, that person has 'accessed a computer network'.... [i]n the terms of the New Mexico Computer Crimes Act."

B. *Application of the Law to the Facts of this Case.*

A person "who knowingly and willfully accesses or causes to be accessed any computer, computer system, computer network or any part thereof with the intent to obtain, by means of embezzlement or false or fraudulent pretenses, representations or promises, money, property or anything of value" is guilty of a violation of Section 30–45–3. Defendant makes no argument as to the "knowingly" and "willfully" requirements.

■ Defendant focuses his argument on the following statutory definitions in Section 30–45–2:

A. "access" means to program, execute programs on, intercept, instruct, communicate with, store data in, retrieve data from or otherwise make use of any computer resources, including data or programs of a computer, computer system, computer network or database;

B. "computer" includes an electronic, magnetic, optical or other high-speed data processing device or system performing logical, arithmetic or storage functions and includes any property, data storage facility or communications facility directly related to or operating in conjunction with such device or system. The term does not include an automated typewriter or typesetter or a single display machine in and of itself, designed and used solely within itself for word processing, or a portable hand-held calculator, or any other device which might contain components similar to those in computers but in which the components have the sole function of controlling the device for the single purpose for which the device is intended;

C. "computer network" means the interconnection of communication lines and circuits with a computer or a complex consisting of two or more interconnected computers.

First, Defendant points out that the definition of "computer" excludes any "device which might contain components similar to those in computers but in which the components have the sole function of controlling the device for the single purpose for which the device is intended." He claims that this exception plainly applies to the case of an "ordinary long distance telephone call." We disagree. The statutory exception would encompass electronic devices built into a microwave oven or a television set that make it easier for a consumer to use those devices. Perhaps it would also include electronic components in a telephone handset that enable the user to use a speaker phone or a telephone's conference capability. It does not include the sort of telephone system described by the State's expert witnesses. Defendant argues that this testimony "shows that the computer-like components contained in a long distance telephone switch simply control the device for the single purpose for which it was intended—to process phone calls." But if "single purpose" is to be construed so broadly, many devices that might otherwise be considered a computer would fit within the statutory exception.

With respect to the definition of "computer network," Defendant points out that "communication lines and circuits" cannot constitute a "computer network" unless the lines and circuits are interconnected with a computer or computers. We agree with Defendant that the definition of "computer network" cannot avail the State in the absence of proof of a computer, as defined by the statute. Defendant's argument is mooted, however, by the determination that the evidence supported a finding that the telephone system utilizes computers as defined by the statute.

■ Defendant's argument that he did not "access" a computer or computer network is not clear to us. Under the statutory definition, to "access" a computer network is to "make use of" the network. Section 30-45-2(A). Defendant appears to contend that one accesses the telephone company computers only by stealing the dial tone or obtaining the company's customer base. We see no such limitation in the statutory definition. Under the normal reading of the phrase "make use of," Defendant made use of the telephone company computer system.

■ The final element of the offense specifically attacked by Defendant is the requirement of an intent to defraud. Defendant argues that the intent must be directed against the owners and operators of the computers. There is, however, no such limitation in the statute. Although doubts concerning the construction of criminal statutes are resolved in favor of the rule of lenity, that rule does not apply unless reasonable doubt about the statute's intended scope persists after a review of its language and history. *State v. Yparrea*, 114 N.M. 805, 808, 845 P.2d 1259, 1262 (Ct.App.1992), *cert. denied*, 114 N.M. 720, 845 P.2d 814 (1993); *see also People v. Versaggi*, 83 N.Y.2d 123, 608 N.Y.S.2d 155, 160, 629 N.E.2d 1034, 1039 (1994) (in interpreting a statute that prohibits altering a computer program, the court "should not legislate or nullify [criminal] statutes by overstrict construction").

■ Defendant then launches a broad-based attack, contending that the legislature did not intend the Computer Crimes Act to

encompass the conduct alleged in this case. Perhaps the legislature was not thinking specifically of the type of conduct committed by Defendant, but if the statutory language encompasses that conduct, we have no power to rewrite the statute. In any event, the few courts in other jurisdictions that have considered this question have indicated that placing a telephone call may be sufficient to support a conviction under a statute that requires the use of a computer.

In *People v. Johnson*, 148 Misc.2d 103, 560 N.Y.S.2d 238 (N.Y. City Crim.Ct.1990), the defendant was charged with the unauthorized use of a computer for offering travelers the use of an illegally possessed AT & T credit card. *Id.* 560 N.Y.S.2d at 239. In refusing to dismiss the indictment, the New York court rejected the very argument advanced by Defendant in the present case, saying:

> Defendant contends that this case does not involve the use of a computer but rather use of a telephone. Further, defendant advances the argument that were a computer violation charge to be sustained here, other prosecutions of patent absurdity would follow, such as using without authorization a washing machine that is equipped with a computerized timer. Defendant's position is ill taken.

> The instrumentality at issue here is not merely a telephone, as defendant asserts, but rather a telephone inextricably linked to a sophisticated computerized communication system.

*Id.* 560 N.Y.S.2d at 241.

The conclusion that telephone communications systems are essentially "computer networks" is also supported by legal commentators. Several practitioners of criminal law recognize in their treatise, Stanley S. Arkin et al., *Prevention and Prosecution of Computer and High Technology Crime* ¶ 7.05[2][d], at 7–39 (1992), that:

> Telecommunications systems have become so tightly merged with computer systems that it is often difficult to know where one starts and the other finishes. The telephone system, for example, is highly computerized and allows computers to communicate across long distances. Other forms of telecommunications create the

means of linking various forms of communications through various forms of technology.

*Id.*

An example of this conclusion can be seen with regard to the "voice mailbox," a sophisticated form of an answering machine. In *Commonwealth v. Gerulis*, 420 Pa.Super. 266, 616 A.2d 686 (1992), *appeal denied*, 535 Pa. 645, 633 A.2d 150 (1993), the court applied a statute under which " '[a] person commits an offense [who] accesses, alters, damages or destroys any computer, computer system, computer network, computer software, computer program or data base or any part thereof.' " *Id.* 616 A.2d at 690 (quoting 18 Pa.Cons.Stat.Ann. § 3933(a)(1)). Affirming a conviction for a violation of this statute, the Pennsylvania court held that the telephone system, which accessed a "voice mailbox," was a computer because it was created by computer software, and messages were stored on computer discs. *Id.* 616 A.2d at 691–93.

In both *Johnson* and *Gerulis*, the question before the court was whether evidence of the telephone service at issue was sufficient to convict a defendant for accessing a computer. *See Johnson*, 560 N.Y.S.2d at 240–42; *Gerulis*, 616 A.2d at 691–93. Thus, in order to affirm Defendant's conviction under Section 30–45–3, we need not hold that making a long-distance telephone call is "accessing a computer" as a matter of law.

The Supreme Court of Washington emphasized this point in considering analogous facts in *State v. Riley*, 121 Wash.2d 22, 846 P.2d 1365 (1993) (en banc). Riley was convicted of three counts of computer trespass and four counts of possession of a stolen access device after he used his home computer to obtain long-distance access codes from telephone company computers. *Id.* 846 P.2d at 1367–68. On appeal, Riley argued that repeatedly dialing the telephone company's general access number and entering random six-digit numbers did not constitute computer trespass. *Id.* 846 P.2d at 1373. In rejecting the argument that dialing a telephone was not use of a computer, the Washington

court relied upon the unrebutted testimony of the State's expert:

> Riley contends the telephone company's long distance switch is not a "computer" under [Wash.Rev.Code § 9A.52.110]. We reject this contention. The trial court explicitly found that the switch is a computer. This finding was based on unrebutted expert testimony. A trial court's findings of fact will not be disturbed on appeal when they are supported by undisputed evidence.

*Riley,* 846 P.2d at 1373.

As in *Riley,* the present Defendant allowed the testimony of the State's experts to the effect that the switching involved in a long distance call constituted accessing a computer network, to go unrebutted. There was, therefore, substantial evidence to support Defendant's conviction for computer access with intent to defraud under Section 30-45-3.

## II. *THE COMPUTER CRIMES ACT IS NOT UNCONSTITUTIONALLY VAGUE AS APPLIED.*

█ Defendant argues that his conviction must be reversed because the definitions of computer and access "are unconstitutionally vague as applied to the fact of a long distance telephone call, thereby denying [his] right to due process of law."

█ Outside of the First Amendment context, "[t]he proscription on vagueness in criminal statutes serves [two] important functions: (1) It allows individuals a fair opportunity to determine whether their conduct is prohibited. (2) It prevents impermissible delegation of legislative authority to police, prosecutors, and courts to determine whether conduct is criminal." *State v. Pierce,* 110 N.M. 76, 81, 792 P.2d 408, 413 (1990). A statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

Obviously, Defendant cannot argue he failed to understand that defrauding people by requesting them to wire money to fictitious participants in a nonexistent class action was a criminal offense. In other words, in this particular case, the Computer Crimes Act merely makes *malum prohibitum* that which was already *malum in se. See* Dodd S. Griffith, Note, *The Computer Fraud and Abuse Act of 1986: A Measured Response to a Growing Problem,* 43 Vand.L.Rev. 453, 484 (1990) ("The acts that constitute computer crimes are all common-law crimes; the only difference is that the perpetrators of computer crime use computers to accomplish their goals."); *cf. United States v. Donahue,* 948 F.2d 438, 441 (8th Cir.1991) ("One does not have to be a rocket scientist to know that bank robbery is a crime; and the statute merely makes *malum prohibitum* ... that which already is *malum in se*"), *cert. denied,* 503 U.S. 976, 112 S.Ct. 1600, 118 L.Ed.2d 314 (1992). Nor are the words used to define "computer" or "access" unusual or overly technical. *See State v. Azar,* 539 So.2d 1222, 1224 (La.) ("ordinary persons of reasonable intelligence" could readily understand statutory definition of "access"), *cert. denied,* 493 U.S. 823, 110 S.Ct. 82, 107 L.Ed.2d 48 (1989).

█ The essence of Defendant's challenge is that, although he may have been generally on notice that defrauding people was illegal, he would not have understood that he was violating this particular statute in using a telephone to facilitate his fraud. While questions of the facial validity of a statutory standard are questions of law, questions of a defendant's knowledge or intent in performing the acts at issue are questions of fact. *People v. Gregory,* 217 Cal.App.3d 665, 266 Cal.Rptr. 527, *review denied* (May 17, 1990), *cert. denied,* 498 U.S. 1014, 111 S.Ct. 584, 112 L.Ed.2d 589 (1990); *cf. Habie v. Krischer,* 642 So.2d 138, 140 (Fla.Dist.Ct.App.1994) (question of whether defendant acted within the challenged statutory standard of "reasonable beliefs" properly for the jury). "[T]he question is whether the statute, or, more closely, the particular words objected to, identify for citizens and law enforcement authorities a core of condemned conduct, and whether this case ... appears to be within the core: the inquiry is contextual." *Commonwealth v. Love,* 26 Mass.App.Ct. 541, 530

N.E.2d 176, 179, *review denied,* 403 Mass. 1106, 532 N.E.2d 690 (1988), *and review denied,* 404 Mass. 1104, 537 N.E.2d 1248; (1989); *see also United States v. Morison,* 844 F.2d 1057, 1071 (4th Cir.1988). The statute in the present case requires that the act be committed "knowingly and willfully." *See* § 30–45–3. A statute requiring the fact-finder to determine whether a defendant committed a knowing or willful violation is less likely to be found vague because the jury must determine scienter. *See, e.g., People v. Gross,* 830 P.2d 933, 938 (Colo.1992) (en banc). Thus, we find that the Computer Crimes Act is not unconstitutionally vague as applied.

### III. *ADMISSION OF BAILEY'S TESTIMONY WITHOUT OBJECTION WAS NOT PLAIN OR FUNDAMENTAL ERROR.*

■ Defendant next challenges Bailey's testimony that, in his opinion, "if a person makes a long distance telephone call from Florida or anywhere else to New Mexico, that person has 'accessed a computer network' in the terms of the New Mexico Computer Crimes Act." Bailey's response was in reply to a hypothetical question whether,

> as an expert in the field of computers and computer networks, [he had] an opinion whether a person who makes a long distance call from Florida to New Mexico, to Clovis, New Mexico, 'accesses or causes to be accessed a computer network' within the meaning of that definition in the New Mexico Computer Crimes Act.

Because Defendant did not object or challenge this testimony at trial, he now argues the district court committed "plain error" by allowing such testimony.

■ Plain error refers to grave errors that seriously affect substantial rights of the accused. *State v. Lucero,* 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993). There is no such error in the present record. Indeed, allowing such testimony is consistent with prior judicial interpretation. In *Herrera v. Fluor Utah, Inc.,* 89 N.M. 245, 248, 550 P.2d 144, 147 (Ct.App.), *cert. denied,* 89 N.M. 321, 551 P.2d 1368 (1976), the plaintiff's attorney asked his expert physician, over defense ob-

jections, whether the plaintiff's disease was an occupational disease within the meaning of the Occupational Disease Disablement Law, NMSA 1953, Section 59–11–21 (2d Repl.Vol. 9, pt. 1). In the lead opinion, Judge Lopez indicated that the trial court's admission of the evidence was consistent with New Mexico Rule of Evidence 704. *Herrera,* 89 N.M. at 249, 550 P.2d at 148; *see also United States v. Buchanan,* 787 F.2d 477, 483 (10th Cir.1986) (not error for expert to testify that defendant's unregistered weapon was the type of device required to be registered), *cert. denied,* 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990). Moreover, in the present case, the danger of confusion was reduced by jury instructions that made it clear that the applicable law was contained entirely in the instructions.

### IV. *DEFENDANT'S RIGHT TO A FAIR TRIAL WAS NOT VIOLATED BY THE PROSECUTOR'S CLOSING ARGUMENT.*

■ Defendant next challenges the prosecutor's closing argument as a "misstatement" of the law regarding the definition of "computer" and "computer network" under the Computer Crimes Act. During closing argument, on rebuttal, the prosecutor argued:

> Now, the last point I want to make to you, this whole stuff about accessing a computer. We can make it complicated, we can make it simple. I want to make it as simple as I can for you. When you're in the jury room, eliminate. There's a choice in the language that the Defendant caused access or caused to be accessed either a "computer" or a "computer network." And the definition of "computer" that you have in the instructions, it's pretty complicated and you might have some trouble with it. So don't use it. Eliminate that option and just see whether or not this Defendant accessed a "computer network," because he certainly did; and that's a pretty simple definition; it's pretty straightforward. It's the kind that I know you'll be comfortable with. . . .

Defendant initially argues that he preserved an objection to this argument by rais-

ing the issue of the applicability of Section 30–45–3 on a motion for directed verdict. Defendant contends that, "[b]ecause the trial court accepted the State's position regarding its alternative charges, Defendant was not required to make a useless objection during closing argument." We disagree. The purpose of requiring trial counsel to make a timely objection is to alert the trial judge to the problem so that it might be corrected. *State v. Alingog*, 117 N.M. 756, 759, 877 P.2d 562, 566 (1994). Defense counsel's earlier argument that Section 30–45–3 did not apply could hardly alert the trial judge to Defendant's later theory that "the prosecution led the jury away from the statutory definition of computer."

■ Defendant further argues that the prosecutor's closing argument constituted "fundamental error." The doctrine of fundamental error is more stringent than that of plain error. *Lucero*, 116 N.M. at 453, 863 P.2d at 1074. "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been donᴄ." *State v. Orosco*, 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992).

■ In New Mexico, counsel have "considerable latitude" in closing arguments. *State v. Pennington*, 115 N.M. 372, 381, 851 P.2d 494, 503 (Ct.App.), *cert. denied*, 115 N.M. 409, 852 P.2d 682 (1993); *see State v. Diaz*, 100 N.M. 210, 215, 668 P.2d 326, 331 (Ct.App.1983). The challenged statement by the prosecutor was based upon the testimony of both Isaacson and Bailey. The prosecutor's emphasis on the statutory language regarding a "computer network" seems justified since that was the phrase used by his expert, Bailey. The closing argument, then, can be viewed as a method of having the jury focus on the testimony that supported the State's theory of how the law applied to the facts. Moreover, not every misstatement of law during closing argument mandates a new trial. *Cf. State v. Copeland*, 105 N.M. 27, 35–36, 727 P.2d 1342, 1350–51 (Ct.App.) (prosecutor's comment on silence of deceased victim and reference to defendant's *Miranda*

rights did not warrant a new trial), *cert. denied*, 104 N.M. 702, 726 P.2d 856 (1986).

Even if we believed that the prosecutor's closing argument gave the jury the wrong impression of the law, we cannot say that the argument so influenced the jury, which was correctly instructed on the law by the district court, as to have deprived Defendant of a fair and impartial trial. *See State v. Omar–Muhammad*, 105 N.M. 788, 794, 737 P.2d 1165, 1171 (1987). The jury was specifically instructed that "[t]he law governing this case is contained in these instructions, and it is your duty to follow that law." The jury was then given the exact definitions of "computer network," "computer," and "access" contained in Section 30–45–2. "In order to find prejudice to [a] defendant we would have to accept that the jury took the comments made during closing and applied them as the law of the case, ignoring the written instructions." *State v. Armendarez*, 113 N.M. 335, 338, 825 P.2d 1245, 1248 (1992). This we will not do. *See id.* The prosecutor's statements do not constitute fundamental error.

## V. THE DISTRICT COURT DID NOT ERR IN ALLOWING AGGREGATION OF THE THREE INCIDENTS.

■ Defendant next challenges his felony conviction, which was based upon the aggregation of three separate misdemeanor offenses under a single fraudulent scheme. Defendant argues that "the State has thwarted the plain language of the statute by aggregating the value of three separate misdemeanors to fabricate a 4th degree felony."

The State based its aggregation theory on the single larceny doctrine as enunciated in Judge Bivins' dissent in *State v. Brooks*, 116 N.M. 309, 862 P.2d 57 (Ct.App.1993), *rev'd in relevant part*, 117 N.M. 751, 877 P.2d 557 (1994). Adopting the State's argument, the district judge stated:

> [I]t appears that the appellate courts can leave it up to the fact finder to make a determination as to whether or not the state has proved that it is one single offense or if it's a series of offenses that are not related. And so, it appears to me that

it would not be appropriate to quash the indictment and it would be more appropriate to let the fact finder or the jury make that determination, perhaps by the use of an instruction as suggested by the dissent in *Brooks* by Judge Bivins.

Since Defendant's trial, the New Mexico Supreme Court has reversed the *Brooks* majority and adopted the rationale advanced by Judge Bivins in his dissent. In remanding the *Brooks* case to the district court, the Supreme Court said:

> In such a retrial, the jury must determine whether crimes committed on separate days were indeed acts motivated by a separate impulse as charged. In words similar to those suggested by Judge Bivins, 116 N.M. at 318, 862 P.2d at 66, the trial court would instruct the jury:
>
> Evidence has been presented in this case that, as part of a scheme or plan to embezzle, Defendant had only one single, continuing, sustained intent for all [or certain combinations] of the takings. To find Defendant guilty of more than one embezzlement, the burden is on the State to prove beyond a reasonable doubt that each act charged was the result of a separate and independent impulse. After considering all the evidence, if you have a reasonable doubt that Defendant acted with a separate and independent criminal impulse for each taking charged, you must find him not guilty of more than any one taking [or combination of takings].

*Brooks,* 117 N.M. at 755, 877 P.2d at 562.

The district court in the present case submitted the case on an instruction patterned on the instruction suggested by Judge Bivins. We believe that this submission is consistent with the Supreme Court's direction in *Brooks* and not reversible error.

## VI. *VENUE WAS PROPER IN CURRY COUNTY.*

Defendant's venue argument depends upon his assertion that, without a single fraudulent scheme, "no material element of the alleged offenses arising out of Raton and Carlsbad occurred in Curry County." Because we have held that the issue of whether Defendant's actions could be aggregated as a single

fraudulent scheme was properly submitted to the jury, we find no merit in this claim.

## VII. *THE DISTRICT COURT DID NOT ERR IN ALLOWING THE AGGREGATION OF THREE INCIDENTS IN ONE COUNT.*

Defendant also contends that fraud is complete once a misappropriation occurs and is not a continuing offense. The State argues that the jury was properly instructed with respect to the single fraudulent scheme and found sufficient evidence to convict. We agree. Based on the discussion under Point V, we affirm.

## VIII. *THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING THE COMPLETE TELEPHONE BILL.*

Defendant next argues that the district court abused its discretion in admitting State Exhibit 4 in its entirety. This exhibit consisted of copies of all telephone bills issued by GTE to Calvin Root for a telephone listed in Room 10 at the Gulf Sands Motel. Included within the numerous pages of bills in the exhibit were records of fourteen calls to the three New Mexico victims, together with hundreds of other long distance phone charges. Defendant made a motion to limit the exhibit as to all calls except the calls to Isbell, Butt, and Grey as "irrelevant" and "prejudicial" under SCRA 1986, 11–401, 11–402, and 11–403 (Repl.1994). The State argued that Exhibit 4 contained relevant evidence which tended to prove that the perpetrator of this scheme used this particular telephone. After reviewing the exhibit, the district court denied Defendant's motion. In evaluating whether the district court erred in not limiting the telephone records to only those portions containing the calls to New Mexico, we may reverse only if a clear abuse of discretion has occurred. *See Behrmann v. Phototron Corp.,* 110 N.M. 323, 327, 795 P.2d 1015, 1019 (1990). In his summation, Defendant attacked the credibility of Thurston as a major witness whose testimony was uncorroborated and unreliable. However, the large number of telephone calls reflected in

the exhibit tends to corroborate Thurston's testimony that: (1) Defendant was involved in the field of telemarketing and (2) Defendant was making enough through such calls to pay Thurston $80 to $500 a week just to pick up the money. Thus, the district court did not abuse its discretion in admitting the entire telephone bill.

IX. *DEFENDANT'S CONVICTION FOR COMPUTER FRAUD AND ATTEMPTED FRAUD BASED ON THE SAME CONDUCT CANNOT STAND.*

Finally, Defendant argues that he cannot be convicted, based on the same facts, of both a completed offense under the specific provisions of the computer fraud statute, Section 30–45–3, and an attempted offense under the general fraud statute, Section 30–16–6. The State offers no response to Defendant's arguments. Defendant's conviction under Section 30–16–6 is therefore vacated.

X. *CONCLUSION.*

All of Defendant's challenges to Count I are rejected. However, we vacate Defendant's conviction under Count II.

IT IS SO ORDERED.

APODACA, C.J., and HARTZ, J., concur.